Good morning. May it please the Court, I'm Valerie Edwards on behalf of Appellants. And we are requesting that this Court reverse the trial court's denial of leave to amend and to specifically reverse the dismissal of the claims against Tiffany and Bosco in the Cervantes case. Well, you contend that you should have been granted leave to cure deficiencies in your equitable tolling allegations, is that correct? Yes, Your Honor. So what specific facts would you allege to cure the deficiencies? The specific facts that would be alleged to cure the deficiencies are based on facts that were already pled in the complaint, namely that the documents that were submitted to the court. Well, I guess what I'm, if in fact we agreed that it should have been dismissed, then if you're only going to allege facts that were already there, why would that, why wouldn't that be futile? Well, the court didn't consider the equitable tolling and the dismissal. The order was phrased such that it was we didn't adequately plead fraudulent concealment. And it's our argument that equitable tolling should have been considered for the TILA claim, the Fair Housing Act claim, and the Arizona Consumer Fraud Act claim, based on the fact that Mr. Almendarez and Mr. Maximo are both only native Spanish speakers. They don't read English. They don't speak English. The transaction or the loans were negotiated in Spanish. The documents were provided in English. They had no reason to believe that there was a TILA violation, because when they started making their payments they were So I guess the whole thing is they signed something that they couldn't read? Couldn't read and was misrepresented to them. They were basically told that the payments are going to be at a certain rate. Okay, if you're signing complicated documents and you know you can't read them, what sort of diligence do they have to get an interpreter? There's no Arizona case that provides that they have, that they're required to obtain an interpreter. But you're asking for equitable tolling, which does require diligence, does it not? Well, it does require diligence, but What proof of diligence did you plead in your complaint? In terms of diligence in discovering the TILA violations, they had no reason to believe that there was a TILA violation until their payments went up. That's not evidence of diligence. That's evidence that they just made their payments until the loan rate started to increase. The question that I'm focused on is the one Judge Callahan raised with you, and that is if they couldn't read or understand the documents in English, one example of diligence would be that they went out and they found someone who could interpret the documents for them. And explain the terms to them. But there's no evidence that they did that. Is that right? Not as currently pled in the complaint, Your Honor. There's not, but there Well, do you have such facts that you can in good faith allege that they did, in fact, try to get someone to translate the documents for them? For example, in the first three business days following the signing of the loan papers? There are I think the answer is no, isn't it? No, not within the first three days of signing the loan papers. Then how about in the first year following the closing of the loan? Do you have facts that you can allege in good faith that they went out and tried to find someone who could interpret these documents for them? The facts that I'm aware of related to This really can be answered no or yes. And I think the answer is no, based on my reading of the record, because I didn't see any such allegations in your complaint. That's correct, Your Honor. What I saw was we kept making payments until the loans went increased or the payments increased, and then we started asking questions about how come my loan's going up. Right. And that's not evidence of due diligence. That's the problem I'm having with your equitable tolling argument And why I'm wondering, when Judge Teelburg dismissed the complaint as futile, he was also thinking, well, if they don't have such facts to allege, then there is no basis for the court to conclude that they're entitled to equitable tolling. I mean, isn't that the analysis that we have to follow? I believe that that is correct. But there are facts in there that indicate that these plaintiffs had no idea that there was a violation or that they had to exercise due diligence in ascertaining a violation. I guess I think the question that Judge Callahan asked you out of the box is kind of one that also bothers me, and that is when you enter into a solemn loan transaction involving what is for most people the largest single debt that they ever undertake in their whole lives, is there no obligation on the part of the borrower to try and inform himself or herself of what it is that they're about to enter into? I mean, you've got to sign these documents in about 50 places, and it takes more than an hour to do it, at least the last time I refinanced a loan. Is that enough to trigger some obligation on the part of the borrower to do more than just sign? These borrowers are uneducated, naive borrowers who basically were approached by the lender representatives and offered these loans on terms that were represented to them, and they trusted the loan representative to represent the terms of the loans and to tell them when they're going through the documents at closing where they're giving them the documents and basically saying sign here, sign here, sign here. And they're rushed through this process. They're not given the opportunity to have the documents translated, and the person sitting on the other side of the table pushing the documents in front of them is telling them that the documents are consistent with what they were represented in terms of the sale of the loan. And so they're basically going through the process. But how could they be consistent with what you never understood? So that's you're saying they never understood anything, but then they're claiming that because everything was in English and they only speak Spanish, right? Right. So then it comes to, well, how can you say what anyone said to you when you don't speak the same language? They are basically being told at the closing table that the documents they're signing are consistent with the terms of the loan. But are they told that in English or in Spanish? In Spanish. But the documents aren't being translated or provided. For example, so I guess you're essentially saying that every lender would need to have documents in all the languages that we have in this country if they're going to lend money? We haven't gone that far. But if we rule in your favor, why would the rule be confined to real estate transactions? Why wouldn't it also apply to the sale of cars or any other kind of a consumer credit transaction? Well, the complaints, our focus is on these transactions as they're related to the Truth in Lending Act. And the purpose of that act is to have consumers make an informed decision. But states have consumer fraud acts that also apply to other things besides real estate. And the thing that we appellate judges always have to consider when we're ruling in your case is what precedent are we establishing for other credit transactions that don't involve real estate? And I'm having a hard time understanding where we draw the line if we accept your position, which I think in response to Judge Callahan's question is that lenders would be obligated to translate all these loan documents into every foreign language for every borrower who doesn't speak English. Well, there is a similar statute in California. Arizona hasn't adopted that. We do have a consumer fraud act which does not require translation, but it does require the creditor who is extending the sale of a loan to a consumer be truthful and honest in the representations made in extending that loan. And they weren't. And the plaintiffs didn't discover those violations until within a year after the filing of the complaint. Mr. Almendarez and Mr. Maximo's payments went up in November of 2008, January 2009, and they joined in to the amended complaint in March. So that was the triggering event here which sort of caused the light bulb to turn on was the payments went up sooner than they expected, right? Well, they didn't expect them to go up at all. At all. Okay. But that was what finally caused them to act. Right. But there is no evidence in the interim that they ever did anything other than make the loan payments to support a theory of equitable tolling since the statute has a one-year cutoff. Not as currently pled. Well, let's go back then, Counsel, because I didn't hear in response to any of my questions you offering me any facts that you could plead, because you don't presently have any, to support the equitable tolling argument. We don't. We would like to have the opportunity to gather those facts and file an amended complaint and plead those. But that's what going to court is all about, is that when those issues are before you, that you have to do something then. But I think we understand your argument on that. I do have another question that I wanted to ask you. Is wrongful foreclosure a cognizable claim under Arizona law? Yes, it is. What's your best case that says it's a cognizable claim? Well, there's no Arizona Supreme Court case on the issue, but there's the Hughes case and the Herring case, which are both district court cases, that basically recognize. All right. So since when did the federal courts get to say what state court law is? That it's, you're correct, Your Honor, that they. So there really is not any cognizable claim. But that being said, let's say if there's something that you, there isn't a case that says there isn't one, but there isn't a case that says there is one, right? Correct. All right. That being said, what are the elements and what are the facts you would allege to support such claim? Because I don't see anywhere in there that you just, you orally say, well, we would like to, you know, there's a, we would like to say wrongful foreclosure orally. But you never put anything forth. Well, the elements for a wrongful foreclosure claim as, the way we would frame it is based on the MERS system and the fact that it's a deed of trust that shows MERS is the beneficiary, MERS isn't the lender, MERS doesn't hold a note. Well, no, that's not exactly the same. What are the elements? What do you have to prove to show a wrongful foreclosure? You know, just like, okay, so what are the elements of theft? You know, that, you know, then you list what the elements are. Since you don't have a case, what are the elements of wrongful foreclosure? The elements of wrongful foreclosure are that a party is foreclosing on a property that isn't in a position to foreclose. Either traditionally it's because there's no, there has been no default. But you're not alleging that here, right? That they were in default of the loan, although you allege the loan should never have been made to them in the first place. Well, we've alleged that the note and the deed of trust are split and the note is no longer secured. And because it's an unsecured obligation, the party who's seeking to foreclose is entitled to foreclose. And that's supported by the … in essence making it a contractual agent and empowering it to foreclose in the event of a default. The language in the deed of trust basically contains the sentence that Morris is the beneficiary, but there's a disclaimer that says that Morris is acting as nominee for the lender. Without regard to labels, which I agree with you are very confusing as applied here, does it not give Morris the contractual authority to foreclose in the event of default? Didn't I read that language in the contract or is that a different case? The language in the contract says that Morris is authorized to take actions, but Morris is, there have been cases that have interpreted that language and looked at Morris' status as a nominee beneficiary and held that they're not a true beneficiary. And under Arizona statutes … You're not answering my question. I don't want to get hung up in labels because we've got a problem here with what those labels mean. I'm just asking a simple question. Did the contract contain language nominating or appointing MERS and empowering it to foreclose in the event of a default? It's a yes or no question. Did I see that language or did I not? Yes. Okay. However … All right. All right. It's a nonjudicial foreclosure statute, and the statutes, because those statutes had to be strictly interpreted, the definition of beneficiary under the Arizona nonjudicial foreclosure statute states that it's a person who is designated in a trust deed is the person for whose benefit a trust deed is given. And MERS is not a beneficiary under that definition, and so their ability to foreclose or their ability to appoint or to assign their, quote, beneficial interest, close quote, to another party is invalid, and that's supported by the Ballestry case, the Hawkins case, the Vargas case, the Agard decision that we supplemented earlier this week that came down from the New York Supreme Court, which did a detailed analysis on the fact that you have an assignment and a deed of trust without an assignment of the underlying interest. This is your splitting theory, right, that once they're split, then it somehow undoes the effect of a secure transaction? Correct. Okay. All right. So … Do you want to save some time for rebuttal? I do. You've used up almost all your time. I will give you some extra time. Thank you. All right. Why don't you sit down and we'll hear from the other side, and then I'll let you give a couple minutes in response. Good morning. Good morning. Bobby Broach, I am counsel for MERS and MERS Corp. I did want to point out just initially in response to your question about are there any other facts, the answer is no. There are no other facts. In fact, the proceedings below turned on issues of law and legal concepts and what are available or viable causes of action. Judge Teelburg gave plaintiffs numerous opportunities to amend the complaint to bring these facts forward. Well, now, would you be the right person to ask about the wrongful foreclosure? I'm one of the right persons to ask about that. All right. Well, assuming that it is just assuming for purposes of argument that it is a cognizable claim, should the appellants have been granted leave to add such a claim to their complaint? Now, it started, I think, that they orally noticed it and there's nothing, it was never included in anything that was presented in writing. So what's your position on that? Yeah, they they And I still, I'm not, I don't know what the elements are at this point. So if you have any clue on that, that would help me. Well, I'll start with that. There are, the elements essentially have to be, first of all, that the buyer or borrower is not in default on their loan payments. And because Arizona is a nonjudicial state, a wrongful foreclosure would be a foreclosure brought in violation of those statutes. In other words, if the statutory process for foreclosing on a home in Arizona was not followed, there would be some perhaps underlying claim that said those statutory procedures were not followed. This is not a judicial process that's being engaged in. Well, as I understand the plaintiff's argument, the statutory procedure says that only the beneficiary can foreclose and was not the beneficiary. Therefore, in essence, it was an illegal, I guess, assignment under the deed of trust, and it is without power to foreclose under the statute. Yes. And Judge Tilburg, first of all, dealt directly with that issue when he considered there were six other class actions that were brought by the same counsel, and they actually brought a complaint alleging a wrongful foreclosure. And the court, Judge Tilburg, in two orders, one on September 30th and one just recently last month on January 15th, said these claims based on that theory of wrongful foreclosure is not available because this is the title of his section, MERS and the MERS-appointed trustees have the power to foreclose. And the reason they have the power to foreclose, essentially, is that under the Arizona statutory scheme, there is a definition for a beneficiary, and that definition for beneficiary is the one that holds those secured instruments, secured legal instruments or title to the security instrument. Go back then, as Your Honor began to, to the actual language in the deed of trust. The deed of trust identifies MERS as the beneficiary, not as the agent for the beneficiary. It identifies it as the beneficiary, and the identity of MERS as a beneficiary is consistent with the Arizona statute of what a beneficiary is. So based on that authority and based on the very language in the deed of trust, Judge Tilburg concluded, and he wrote in both of these orders, that MERS has the authority to foreclose. He says, indeed, the deeds of trust state that MERS will serve as the nominee for the original lender. Thus, from the very language of the deeds of trust, MERS is acting as the current holder of the promissory note. Plaintiffs have not cited any legal authority where the naming of MERS and the consequential splitting of the note was caused to enjoin a nonjudicial foreclosure. So let me see if I can summarize your position to make sure I understand it. Even though traditional real estate law, and I assume the statute was written with that in mind, contemplates the notion of a deed of trust naming a beneficiary who is designated by the lender, and in the conventional situation, if there's a default, that would be the entity that would foreclose. In this case, by contract language in the deed of trust, MERS has been designated for all purposes in the future as the beneficiary, without regard to what happens to the underlying loan itself. That is correct. That is correct. In other words, as that note is sold, MERS remains the lien holder of record. And so the issue then sort of gets down to, can the lien holder of record be a different entity or person that has been designated by the lender to serve as the lien holder of record? And the answer to that question for more than 100 years is yes. There is no prohibition against a lien holder of record being the agent of that actual lender as that note travels through the commercial world. And so the lien holder of record, I mean, going back, and these are in our briefs, to the law in Utah for Ogden v. Barker, the mere fact that the mortgagee is not the owner of the notes but was simply a trustee or agent for the owner doesn't affect the validity of the mortgage. So MERS serves as that lien holder of record, which is a different entity, if you will, than the lender itself, and there is nothing prohibited about that, and that's been the law from way back to the 1800s and recently affirmed by the Minnesota Supreme Court, which is another nonjudicial foreclosure state in Jackson v. MERS. And so not only is that not the law, it's based on principles of simple contract law and principle and agency. So, yes, that is our position, and there's nothing to prohibit it. And, by the way, that's the very legal theory that was proffered by the plaintiffs as the grounds to amend for purposes of the wrongful foreclosure, and that's why Judge Teelberg concluded it would be futile. That's why he ruled in the other cases subsequent that wrongful foreclosure claims, using that theory, would be futile as a matter of law. Okay. Thank you very much. May it please the Court. Thomas Hefferon. I'm going to pick up on the issues related to the motion to amend and the denial of the motion to amend. As Your Honors know, there were two, really two, amendment issues. One is the one Your Honor raised, Judge Callahan, as to whether the Court should have granted the motion with leave to amend, and the second is the antecedent question of whether the second amended complaint was properly denied, the motion for leave on that one. I think the briefs are pretty straightforward on that point. The only things that are discussed in the briefs are the first claim, which is truth in lending, and the seventh claim, which is the MERS claim. Judge Toborg, as Your Honors discussed, identified that since the Truth in Lending Act claim was barred by statute of limitations, that nothing was proffered in the second amended complaint to cure that. And, in fact, nothing was proffered to cure that. There was no allegation as to either equitable tolling or equitable estoppel. And so, therefore, Judge Toborg properly refused to allow that amendment and direct the Court specifically to the only allegations that even bear on this, which are paragraphs 96 and 97, and they're conclusory. They don't say anything, anything the defendant did. They don't say anything that the plaintiff could have done and certainly say nothing about diligence. And so in light of that and in light of the questions from the panel, I'll move on to the second question that Your Honor, Judge Callahan, you asked about the refusal to allow further amendment. Should Judge Toborg, when faced with an oral request and an indication that there might be other claims, did the Court err in the exercise of its discretion in nonetheless entering a judgment and not providing leave to amend? As we say in our briefs, we think that Judge Toborg did not exercise his discretion improperly or it was not irrational or improper for the Court at that point to refuse to allow an amendment. Well, how long had things been going on at that particular time? It was four or five. This was proper of the fourth complaint. So there were three complaints. But in terms of time, too? About six months, a little over six months. And they had an original complaint, a First Amendment complaint. They had proposed a Second Amendment complaint. And then all they did was they said that there was a possibility they might have new causes of action. They didn't explain them. They didn't explain what the elements were, why they thought they could meet them. And they didn't proffer any, under local rule as required, they didn't proffer any allegations, set of allegations that would identify those as claims. They, in fact, basically weren't defending the lawsuit that was before the Court. They were suggesting they wanted to file a brand-new one within the shell of the lawsuit that didn't state a claim. And in light of that, Judge Talborg, who was at that point, again, was on the suggestion of whether a fourth complaint could be proffered, did not act irrationally in deciding that it didn't state a claim and that the promise of a possibility that there might be some claims that could be perhaps pled, no explanation of what the elements were, why it ought to be met, that none of that was something that Judge Talborg was required by the law to permit. So the district court was faced with no written motion to amend and therefore no written submission of an amended complaint and no specifics, even at oral argument, offered by counsel as to what would be pled to cure the defects which the court was concerned about. That's correct. That's correct. And we review all of that for an abuse of discretion. Yes, that's right. And I would just make one point in closing, which is the plaintiffs do point and submit supplemental authority, point to the fact that Judge Talborg, who now handles the multidistrict litigation that concerns MERS, has actually done something which they contend is a little different. They contend that what actually Judge Talborg has done is he has dismissed those claims, as Mr. Brochin pointed out, and he has allowed that the dismissal will not yet be entered with prejudice. That plaintiffs, however, as part of his discretionary management of the 90 cases in the MDL, once he gets through the series of motions to dismiss, he will give plaintiffs an opportunity to file a motion to amend to see if that can be cured. So you're saying that's not ñ I mean, the thrust of what they're saying, my understanding is, that the fact that he granted some people leave to amend, that that's unfair to them and must mean that he believes there is something out there that someone could say. And that's the thrust of what they say. The problem is, first of all, it's mischaracterized what Judge Talborg has done. He hasn't given them authority to amend. He said that they would have an opportunity to file a motion to amend to show whether they could cure that complaint, which is different from the complaints that were before him in Cervantes. Your last statement caused me to wonder, is this ñ is this moot or premature if we don't have a final ruling on the amendment of the complaint? But you're saying that's a different ñ Those are different. That's a different proceeding. Cervantes was never part of an MDL. It was dismissed about a week and a half before the MDL motion was filed. So the MDL was constituted afterwards. I was just wanting to point out to the Court the circumstances are quite different. Judge Talborg is now trying to manage 90 cases and with a different complaint, different series of issues. Here he's dealing with one case, and we think, again, as we point out, we don't believe it was irrational and abusive discretion. Well, if you could amend on any of the things, it would depend on the facts of each case, right? That's correct. That's correct. And there was no ñ again, there was no explanation of what these claims were, what the elements were. There was no easy place to look because, as Your Honor pointed out, there is no authority in Arizona that says there's even a wrongful foreclosure claim. So Judge Talborg, who, of course, is an Arizona district judge and is used to applying Arizona law, was left in the dark not only about what the facts were that were going to be alleged, but also about what the legal theory was. They call it wrongful foreclosure. You look in the books in Arizona, there is no such thing. And maybe Judge Talborg could find that there is, but, again, he was not given enough material, and so he did not abuse his discretion. Okay. Thank you. Thank you very much, Mr. Appleby. Rapper up. Run to the podium. I have two whole minutes. My name is Tim Thomas, and I represent Tiffany & Bosco. Tiffany & Bosco is a Phoenix law firm that devotes a large part of its practice to serving as trustee under deeds of trust. Under Arizona law, lawyers, title companies, and other qualified people can serve as trustees. The Arizona legislature has determined that, except in unusual circumstances, trustees should be immune from suit. First of all, I'd like to point out that when there's a dispute between a borrower and a lender, you never need to name the trustee. Under 33807E, a ruling or an order against the beneficiary is binding upon the trustee. But the statute even goes further and provides that there's only two circumstances in which there's a proper claim against the trustee, and that is if there's an allegation that the trustee breached the terms of the deed of trust or breached the terms of the trustee's statute. The statute provides not only does the trustee entitled to be dismissed if they're improperly named, the statute even says we really mean it. Immediately dismissed and an award of attorney's fees is mandatory. The complaint in this case sought injunctive and declaratory relief and named Tiffany and Bosco. To get that injunctive and declaratory relief, Tiffany and Bosco never needed to be named because if they got injunctive or declaratory relief against the beneficiary, it was binding upon Tiffany and Bosco. The plaintiffs alleged when asked what is it that Tiffany and Bosco did, there were vague allegations, acted unfairly, and facilitated fraud, but there was no allegation that they breached the terms of the deed of trust or that they breached the trustee sale statute. I would say one word about this appointment. They contend Tiffany and Bosco was properly named in this case because they were never properly appointed as trustee because MERS never had the authority to appoint a successor beneficiary. Your Honors, we submit that the authority that MERS has pointed out demonstrates that MERS did have the authority to act as beneficiary. I would also note that under the Erdley decision, under Arizona law, an agent of the beneficiary can act on behalf of the beneficiary. So in the unlikely event that MERS isn't the beneficiary, they certainly were the agent of the real beneficiary and therefore could act. I would also submit, Your Honor, though, that this business about whether or not the beneficiary is really a beneficiary is an issue that the trustee need not be and should not be caught up in. That is an issue between the lender and the borrower and is an issue that the Arizona legislature, again, has determined the trustee should not be involved in those cases. The trustee here never should have been named. Notice was given by letter to the plaintiffs. Tiffany and Bosco should be out of this case. They did not need to name them and, therefore, Judge Teelborg's decision dismissing Tiffany and Bosco and awarding the fees, which are mandatory under the statute, should be affirmed. Thank you. I'm giving them some extra time, so go ahead. Yeah. May it please the Court. Howard Cain for the Federal Housing Finance Agency. Your Honors, I have one single point I'd like to emphasize beyond the contents of our briefs, is that this Court's decision that we cite in our brief, in SAHNI, S-A-H-N-I versus American Diversified Partners at 83 Fed 3rd, 1054, a point to which appellants don't respond, provides a totally applicable and we believe dispositive analytical roadmap for the points made by the government in its brief. If you change the agency name, Federal Deposit Insurance Corporation in this case, to Federal Housing Finance Agency, everything flows. The statutory provisions on which the Ninth Circuit relied in determining that the FDIC's right to liquidate the assets of the ADSB in that case is clearly protected by the statutes in question. Those statutes in question are, I believe, word for word, Your Honors, identical to the statutes governing the Federal Housing Finance Agency. The roadmap that is laid out in this decision in which the Court goes through the powers of the agency, why Congress granted the agency the power to dispose of the assets in the receivership or conservatorship, and it makes the key point, and this key point is why the government intervened in this case. As the Court knows, there are many cases in the circuit raising identical issues, and defending these cases is costing the United States, the enterprises, and the agency untold dollars and, in our view, a wastage of dollars. So are you saying we won't get paid if we keep spending the government's money or what? I can't go that far, Your Honor. We still have to do our job. Absolutely, Your Honor. And the point that this Court made that I wanted to emphasize is essential to these enumerated functions in that case of the FDIC is the FDIC's ability to carry out its basic functions as a receiver, and it also was the same for a conservator, free from judicial restraint pursuant to 12 U.S.C. 1821J. I would respectfully submit that under the statutes enacted in 2008, modeled on and identical to the statutes on which this Court relied in this case, the same conclusion would apply, that essential to the enumerated powers governing the Federal Housing Finance Agency's ability to carry out its basic functions as conservator free from judicial restraint, it requires that this type of relief, injunctive, temporary restraining order, and the like, that was rejected below and in the realm of these proceedings, not infrequently we get a notice, a plaintiff in one of the cases in the MDL, has moved for some type of emergency or temporary relief. That causes an enormous dedication of resources to respond. And what we, the government, respectfully suggest is that the Court make clear that the Sonny case applicable to the FDIC fully applies here, and that would clarify the issues and would be the relief that the government requests. Thank you. Thank you very much, Mr. King. All right. Ms. Edwards, I'll follow up. Oh, absolutely. Sorry. It's going to be, I guess, Mr. Knepper. Thank you. Just real quick to Mr. King's point. The problem with his position is that he's citing a case that deals with a receiver as opposed to what he is, and that's a conservator. But as a practical matter, what difference does it make? Essentially, the argument that I heard him make is that his agency has statutory powers which are akin to a receiver's powers in order to try and gather up the assets of the entity that they've taken over, and you're, in essence, obstructing the discharge of the agency's duties by constantly seeking injunctive relief against the government to prevent them from carrying out that duty. The issue there, I think, is that they've got the right to sue and be sued. They're supposed to conserve the assets, and quite frankly, if part of their duties in the past have been to facilitate the MERS system, they have an obligation to those people that have been wronged by that system. I guess maybe we'll get into this in the next case, but one of the things I'd like you to address maybe in the next case, you can do it now if you want, is the notion that we should stop the foreclosures of all of these properties, even though the borrowers are all in default on the loans, and allow them, in essence, to continue to live in the property, I guess, free of any obligation to pay for it. And that just doesn't strike me as equitable. And, yeah, I'll deal with that right now, because that's really the issue that I wanted to talk about the most. No one is suggesting that the folks that own these homes, especially the three in this case and the one in the next, don't have an obligation to repay the money. What we're fighting over is whether or not there's a security interest that allows the banks to come now and take their property. Right. Because I assume the principal asset that they have to discharge their duty to pay the loan back is the house. Absolutely. And that's why the traditional model has been you borrow money from your banker, and if you don't pay him, he takes your house back. Right. And what you're asking us to do is declare that there may have been a problem with the loan in the first place, but we're not going to allow the lender to foreclose on the principal asset that the borrower has, and the lender is going to have to just be a general unsecured creditor and get his loan back some other way. What we're saying is under these circumstances, and quite frankly, MERS has tried to, and all the banks that created MERS, changed the entire real property system in the whole United States, and that's why you've got cases coming out of it. Well, changing it in what way? They don't have to go to the county recorder every time there's a resale of the underlying note in the secondary mortgage market, or if it gets securitized, it's sold as a security. So we don't have to do all of the, I guess I'll call it the paperwork, the ministerial stuff. But in essence, it's still a real estate transaction with a loan that is secured by the property, isn't it? The problem is that the person that owns the house, that borrowed the money, is never sure, at least under the current circumstances, who they owe the money to, who has the note and the obligation, because as we've laid out in our briefs and as the courts have obviously read in the newspapers, there's a big controversy out there as to who actually is owed the obligation. Well, but the flip side is, and I think what Judge Tallman was addressing, is in none of these cases do we have anyone that's made any sort of deposits of any kind of payments whatsoever. I think one person said they could pay the property taxes, but essentially no one's paying any payments or hasn't set aside anything, right? Right, so they're in default on the note. There's no question about that. The problem is that if they're in default on the note, as Mr. Beauchamp would want you to believe, that allows anybody to do anything under any circumstances as long as they can say, gee, I've got a deed of trust. What we're saying in these cases is that whoever it is that's going to come in and claim to have the authority under the deed of trust to foreclose needs to show someone that they have the authority to do that. And the problem that we're running into in this court as well as every other court in the nation is faced with the issue of who really has that authority. But I guess I understand the legal argument, but at the time that the loan is originated, the borrower, whether he speaks English or not, understands that if he doesn't pay on the loan, he loses his house. And that hasn't changed without regard to who it is that's behind the nonjudicial foreclosure. Except that it doesn't allow they, I think, believe that some stranger to their transaction can't come in and take their house. Well, it's the person that they nominated or that entity's successor under the terms of the original loan. I'm having a hard time understanding why it's wrong to foreclose when the borrower is in default. Because in the nonjudicial procedures, there's no judicial oversight. And the problem that we run into is that these homes are being taken and people are just assuming that the entities that are taking the houses have that authority. And you've seen, you know, there's lists of cases and everybody's saying that they say something that they perhaps don't say, but I'm sure that's typical for your lives. The fact of the matter is, in several of these cases, you've got situations where a second trustee has foreclosed and the first trustee, MERS, comes back and says, hey, wait a minute, you didn't give me notice. I want my day in court. Routinely, the courts have said, well, you know, MERS, you didn't do it right. When the courts look at the system that MERS is trying to implement throughout the nation and gives a reasoned decision, such as Judge Grossman out of New York that came down with one last week, and he actually says, I'm giving a reasoned decision, that's why I used that term, he chapter and verse goes through exactly what we believe is the proper analysis of where this takes us. And so you've got the Supreme Court of the state of Massachusetts, the one that we cited to you last week, again, doesn't deal with MERS but talks about the securitization issues and what the havoc it's wreaking on the real property laws. And so the problem, as I said, is the fact that there's a nonjudicial foreclosure procedure that's been in place for hundreds of years, and now you've got a beneficiary, i.e. MERS, that isn't really a beneficiary trying to control who it is that can come and foreclose on your house. And it's creating all sorts of issues. I'm going to let you run over, and I know we're going to hear from you again. Is there anything else that you want to say on Cervantes before I? Finally, timing, I guess, is everything in this world. But if Judge Teelburg had waited a week or two, perhaps he might have given us leave to amend or leave to file our motion to amend like everybody else. But I still am not satisfied from Ms. Edwards' answers what it is that you would say if we gave you leave to amend. At the very least, we'd talk about the MERS issue, because I believe that Judge Teelburg, like everybody else, is reading the newspapers, and that's why he's now taking a different tact on whether or not. Well, that's a pretty outlier comment that judges make their decisions based on the newspaper. And I'll just leave you with this. The more these cases get read and the more issues get before the Court of Appeals and the bankruptcy courts and the trial courts, the more you're seeing more and more reasoned opinions that basically say. Well, I know, but, you know, if you kind of watch this court, just because Judge Reinhart says something, I don't do it. So that's – and that's another judge. That's not the newspaper. I understand. I didn't mean to infer that. I think we understand your position. The case just argued is submitted for decision.
judges: Thompson, Tallman, Callahan